# IN THE COURT OF APPEALS OF IOWA

No. 22-1084
Filed March 29, 2023

**JENNIFER LEE BLACKWOOD f/k/a JENNIFER LEE KNOP,**
    Plaintiff-Appellant,

**vs.**

**BROCK ALLEN KNOP,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Pottawattamie County, Margaret Reyes, Judge.


Jennifer Lee Blackwood appeals the district court's denial of her motion to extend a domestic-abuse protective order and the court's ruling that Brock Knop's violations of the protective order were not wilfull.  **AFFIRMED.**


Mark Simons of Simons Law Firm, PLC, West Des Moines, for appellant.

Robert J. Engler of Cambridge Law Firm, P.L.C., Atlantic, for appellee.


Considered by Bower, C.J., and Badding and Buller, JJ.

**BOWER, Chief Judge.**

Jennifer Blackwood appeals the district court's denial of her motion to extend a domestic-abuse protective order and the court's ruling that Brock Knop's violations of the domestic-abuse protective order were not wilfull.  In light of the broad discretion trial courts have in punishing contempt and the showing required to extend a protective order, we affirm.

*Tennessee domestic-abuse protective order.*  In 2020, Blackwood and Knop were married and and living in Iowa with their two children, B.K., born 2015, and A.K., born 2017.  On November 3, Blackwood left Iowa with the children and went to Tennessee where she has extended family.  On November 6, Knop appeared in Tennessee and demanded Blackwood and the children return to Iowa.  Knop would not leave when told to do so, and the police were called.  The police transported Blackwood and the children to a domestic-abuse shelter, and Knop was told by Tennessee law enforcement to return to Iowa or face arrest.

On November 9, Blackwood obtained a temporary protective order under the Tennessee Domestic Abuse Act.  On December 9, a hearing was held at which Knop appeared and was represented by counsel.  The Tennessee court issued a final protective order.

*Iowa domestic-abuse protective order.*  On December 17, Blackwood filed a petition for relief from domestic abuse in Iowa, avowing that since the Tennessee hearing, Knop had been texting her and leaving "voicemails threatening me and my family in various forms suggesting that if I did not return home with the [children] that he would do one or more bad things."  She asserted he left a voicemail "stating

that he did not want to hurt me but that I was leaving him no choice." Blackwood stated:

> Based on everything [Knop] has done since I have left Iowa and considering that I have ongoing divorce litigation in Pottawattamie County, I am afraid that [Knop] will find a way to attack me, our children, or my family. I am in fear for my safety. I know that [Knop] has many guns and he has not only threatened to kill me and threaten to kill other people who have been involved in our lives.

The Iowa court granted a temporary protective order.

On May 6, 2021, a combined hearing was held on an Iowa petition for dissolution of marriage and Blackwood's petition for relief from domestic abuse. The Iowa district court granted Blackwood's request for a final domestic-abuse protective order, specifically finding Knop committed one or more acts of domestic abuse.[1] The protective order informed Knop he could not have "any contact" with Blackwood. Further, "[Knop] shall not communicate with the protected party in person or through any means including third persons. This restriction shall not prohibit communication through legal counsel."

*Dissolution of marriage.* On May 21, the court entered a decree dissolving the marriage between Blackwood and Knop; placed the parties' two minor children in Blackwood's physical care and sole legal custody; and ordered Knop "to undergo a substance abuse evaluation and to follow up on any recommendation from this substance abuse evaluation," "undergo a psychological evaluation and

---

[1] Iowa Code chapter 236 (2021) defines "domestic abuse" as an assault between persons in a domestic relationship. *See* Iowa Code § 236.2(2). An assault occurs when a person, while having the apparent ability to do so, commits an act intended either (1) to cause pain, injury, insult, or offense to another or (2) to place another in fear of contact that will cause pain, injury, insult, or offense. *See id.* § 708.1(2)(a), (b).

to follow up on any recommendations of this evaluation," and "to enroll and complete the Iowa Domestic Abuse Program." In addition, the court "decline[d] to extend any court ordered visitation" to Knop but allowed him to "seek court intervention to restore his rights to visitation upon demonstration of his compliance with the mandates in this final Decree. Any future modification of this order shall consider the professional opinions of the therapists that are treating the two minor children . . . ."

*Contempt proceedings and application to extend protective order.* On January 18, 2022, Blackwood filed an application for rule to show cause— commonly called a contempt application—alleging Knop had willfully violated the protective order on several occasions (eleven counts).[2] She asked that Knop be punished for each violation of the protective order and that he be ordered to reimburse her for attorney fees and costs.

On April 21, 2022, Blackwood filed an application to extend the protective order, asserting Knop had continued to contact her despite the protective order and stating she still feared for her safety and wellbeing.[3]

A hearing on the filings was held on May 5, 2022. The district court issued its ruling on June 16, summarizing the trial testimony in this manner:

> [Blackwood] testified that [Knop] had contacted her numerous times through Facebook, by text message, as well as through third parties (his mother and daughter). The parties agree . . . [Knop] first contacted [Blackwood] in October 2021 after [Blackwood]'s conversation with mutual friend [C.H.] during which [Blackwood] told [C.H.] that she still loved [Knop]. At some point after entry of the protection order [Blackwood] had also "unblocked" [Knop] from

---

[2] Knop sought and obtained continuances of the contempt hearing. New counsel appeared for Knop on April 21.
[3] The permanent protective order was to expire in May 2022.

accessing her Facebook page. Sometime after [Blackwood]'s phone call with [C.H.], [C.H.] told [Knop] about [Blackwood]'s feelings. [Knop] admits that he . . . looked at [Blackwood]'s Facebook page and liked one of her postings on her Facebook page after his conversation with [C.H.] [Knop] further testified that based on [C.H.]'s information he interpreted at least one of [Blackwood]'s postings as an attempt to communicate her feelings with him directly. Although he testified that it was an "accident," [Knop] admits that he sent her a direct message through Facebook in which he expressed his love for her as set out in [Blackwood]'s Count One of the petition.

Following this initial contact, [Knop]'s mother and daughter both reached out to [Blackwood] on [Knop]'s behalf as set out in Counts Two and Eleven of her petition. However, [Knop] denies that he asked either of them to contact [Blackwood] on his behalf, but admits that they likely reached out based upon [Knop] missing his children and being a family.

[Blackwood] also alleges that [Knop] sent her a number of text messages from a variety of cell phone numbers expressing his continued love and devotion to her. [Blackwood] testified that she interpreted [Knop]'s statements such as "you're mine" "you belong to me", "always will" not as romantic but threatening. [Knop] denies sending these text messages directly. As part of [Knop]'s case, [Knop]'s 16-year old friend, [B.], testified that *he* authored the text messages to [Blackwood] using a texting application. [B.] testified that [Knop] is [a] father-figure to him. [B.] admits that he used [Knop]'s words in the text messages and that he suspects [Knop] knew what he was doing, but that [Knop] never asked him to send the messages. [Knop] denies that he specifically requested that [B.] send the messages, but similarly admits he knew that [B.] was sending the messages to [Blackwood].

The court found Knop had violated the protective order "when he messaged [Blackwood] through Facebook in October 2021." But the court concluded the conduct was not willful:

The parties here have a history of communicating in violation of a protection order. In January 2021, [Blackwood] previously reconciled with [Knop] while a protection order was in place. Similarly here, the court finds that [Blackwood] invited [Knop]'s contact when she reached out to their mutual friend and expressed that she still loves [Knop] which the court believes she knew would be communicated to [Knop]. While the court doesn't condone [Knop]'s actions and highly doubts that [Knop] wasn't aware that his young friend [B.] was communicating with [Blackwood] on his behalf, the court finds that the evidence falls short of proving a bad or evil

purpose in disregard of the rights of others. While [Knop]'s contact with [Blackwood] clearly violated the court's order, the contacts were not so egregious or unreasonable that a finding of contempt beyond a reasonable doubt is warranted considering the history of the parties. While the court understands why [Blackwood] could have felt threatened by some of the language communicated to her in [Knop]'s text messages,[4] the court doesn't find that [Knop]'s messages were intended to be communicated as a threat. Nor does the court find that the communication by [Knop]'s mother or daughter were done at the behest of [Knop]. Finally, while the court finds [Knop]'s communication with [the witness] misguided at best, the court doesn't find this communication constitutes a violation of the protection order between the parties.

The court did order Knop to pay Blackwood $2000 toward her attorney fees related to the contempt matter.

Concerning the application to extend the protection order, the court concluded Blackwood's acknowledged fear of Knop "has [not] been substantiated by [Knop's] recent actions."[5] The court noted Knop lives in Iowa and "has started a new job" and Blackwood lives in Tennessee. The court warned Knop any future acts of domestic abuse would likely result in the re-issuance of a protective order.

Blackwood appeals, contending the extension of the protective order is warranted and Knop's violations were willful. We will address these issues in reverse order.

---

[4] Knop's appellate brief acknowledges some of his messages "could have left [Blackwood] feeling threatened."

[5] The court also noted, "Furthermore, there is no showing that [Knop] attempted to contact [Blackwood] under the current protection order until after [she] had unblocked [him] from Facebook and reached out to their mutual friend who in turn relayed that information to [Knop]." We are troubled by the court's finding Blackwood "invited" Knop's actions. There is no indication Blackwood asked the friend to transmit her feelings to Knop, and Knop testified he searched to find whether Blackwood unblocked him on social media.

Actions for contempt in Iowa "are quasi-criminal, even when they arise from civil cases." *See Zimmermann v. Iowa Dist. Ct.*, 480 N.W.2d 70, 74 (Iowa 1992). "We may review a trial court's dismissal of an application for contempt or its refusal to find a party in contempt upon a direct appeal by the aggrieved party." *Patterson v. Keleher*, 365 N.W.2d 22, 24 (Iowa 1985). "Our review is not de novo; while we give much weight to the trial court's findings of fact, we are not bound by them." *Id.*

The judicial enforcement of Iowa Code chapter 236 protective orders is governed under section 664A.2(2) ("Punishment for a violation of a [chapter 236] protective order shall be imposed pursuant to section 664A.7."). A violation of a no-contact order entered under Iowa Code chapter 236 is a simple misdemeanor. Iowa Code § 664A.7(5). "Alternatively, the court *may* hold a person in contempt of court for such a violation . . . ." *Id.* (emphasis added).

> A party alleging contempt has the burden to prove the contemner had a duty to obey a court order and willfully failed to perform that duty. If the party alleging contempt can show a violation of a court order, the burden shifts to the alleged contemner to produce evidence suggesting the violation was not willful. However, the person alleging contempt retains the burden of proof to establish willfulness beyond a reasonable doubt because of the quasi-criminal nature of the proceeding.

*Ary v. Iowa Dist Ct.*, 735 N.W.2d 621, 624 (Iowa 2007) (citations omitted). The *Ary* court explained that to find the person's disobedience was willful, there must be "evidence of conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not." *Id.* (ciation omitted).

The protective order clearly stated Knop "shall not communicate with the protected party in person or through any means including third persons."  Knop was aware of this prohibition, sending an October 2021 message to Blackwood on social media imploring her, "please don't turn me in I won't message you again . . . ."  There is no doubt Knop knowingly violated the protective order on this occasion.

Several more messages were texted to Blackwood on December 30 and 31, 2021, and January 2, 2022, 8, 9, 10, 13, 14, and 16.  All of these text messages came from phone numbers unknown to Blackwood but who she suspected were from Knop.  Blackwood did not respond to any of the messages.

Knop's sixteen-year-old friend B. testified at the contempt hearing he "did send some text messages to [Blackwood] through a burner number."

> Q. What involvement did [Knop] have in telling you to send messages?  A. He did not tell me to send any of the messages.  It was around Christmastime.  I was helping him take down a barn.  We were pulling wood out, and he just seemed really in the dumps, so I grabbed his phone, and he asked me what I was doing, and I said, Mind your own business.  And I knew he had the app on his phone, so I asked him, If you could say anything to [Blackwood], what would you say?  And he told me.  And I typed up pretty much what he said, sent it, printed it before he could see it, closed the app, sat it down, went back to work.
> Q. Was that the only time you did that?  A. I did it like seven or eight times, maybe more something like that.
> Q. Did he know that you were doing that, that you were sending actual messages?  A. I'm pretty sure that he—he knew.
>    . . . .
> Q. Okay.  If you could turn to [exhibit 12], do you recall sending that one?  A. Yes.  He showed me this TikTok, or it was like a TikTok or a post or something.  I attached it and sent it because he said that's one thing he'd want to say to her.

On cross-examination, B. admitted he used Knop's phone to send the messages, knew there was a "burner app" on Knop's phone, selected the area

code the app would use to generate a phone number, the messages were sent while the two of them sat in Knop's truck or were at Knop's house, and the messages were Knop's words.

Knop testified:

> I figured out right away what he was doing. He just would ask me, If you could, you know, say one thing to [Blackwood], what would it be? And I'd sit there and think and tell him, and I'm assuming he was typing it up and—
> Q. Did you want him to do that? A. Not necessarily. I mean, there was a part of me that, obviously, doesn't want to get [B.] involved in anything, but there is also a big part of me that wants to— you know, we've got two [children] together. At some point we're gonna have to talk and coparent, you know, I just want to be a daddy for sure, you know.

Here, the trial court found Knop violated the protective order, ordered Knop to pay Blackwood's attorney fees, and otherwise imposed no punishment. While we might find otherwise under a different form of review,[6] we cannot say the district court clearly abused its wide discretion. *See In re S.D.L.*, 568 N.W.2d 41, 42 (Iowa 1997) (noting trial courts are granted "wide discretion in determining and punishing contemptuous behavior," and "[w]e interfere in such judgments only when discretion has been clearly abused, that is, when the court's decision rests on unreasonable or untenable grounds, or erroneous legal conclusions").

Next, we turn to the application for extension of the protective order. The party seeking to extend a chapter 236 protective order must show by a

---

[6] In context of the other facts, we would not consider Blackwood telling a mutual friend that she still loves the father of her children an "invitation" to Knop to communicate with her in violation of a no-contact order. Nor does the record support Knop's assertion Blackwood had the mutual friend "relay messages to him." We also note Blackwood did not respond to any of Knop's communications after the May 2021 protective order and dissolution of marriage. We are not persuaded Blackwood invited Knop to communicate with her.

preponderance of the evidence "the defendant continues to pose a threat to the safety of the victim, persons residing with the victim, or members of the victim's immediate family."[7]  Iowa Code § 236.5(2).  "The text of the statute indicates this is an objective inquiry rather than a subjective inquiry."  *Wendt v. Mead*, No. 16-0928, 2017 WL 510972, at *2 (Iowa Ct. App. Feb. 8, 2017).

We, like the district court, are unable to find Blackwood proved by a preponderance of the evidence that Knop poses a threat to Blackwood's physical safety in Tennessee.  Nothing in this record suggests Knop has driven from Iowa to Tennessee since the May 6, 2021 protective order was issued and the dissolution decree was filed.  The dissolution decree does not currently allow Knop to visit his children.  And the decree clearly informs Knop of the actions he must take before asking the court for a modification of the visitation provisions of the dissolution decree.  *See Fettkether v. Kaster*, No. 11-0373, 2012 WL 170692, at *3 (Iowa Ct. App. Jan. 19, 2012) (acknowledging the applicant's continuing distrust of abuser but denying an extension of a protective order where "the parties live approximately seventy-five miles apart" and the father "will have to suffer the consequences of negative presumptions concerning his future role in his children's upbringing").  We therefore affirm.  We deny Blackwood's request for appellate attorney fees.

**AFFIRMED.**

---

[7] By contrast, where a protective order is issued pursuant to Iowa Code section 664A.2(1) (after a criminal conviction for enumerated offenses), *the defendant* has the burden to prove they no longer pose a threat.  *See State v. Petro*, 981 N.W.2d 686, 691–92 (Iowa 2022) (finding that defendant met his burden where protected party and defendant lived in same small community and "more than ten years have elapsed since any violation of the no-contact order").